**U.S. RESTAURANT PROPERTIES OPERATING L.P., and U.S. Restaurant Properties, Inc., Appellants,**

v.

**MOTEL ENTERPRISES, INC., Appellee.**

No. 09–02–018–CV.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 6, 2003.

Decided April 17, 2003.

James R. Jordan, Shannon, Gracey, Ratliff & Miller, LLP, Dallas, Joseph W. Spence, J. Christopher Nickelson, Shannon, Gracey, Ratliff & Miller, LLP, Fort Worth, for appellants.

Joe McElroy, Robert T. Cain, Jr., Zeleskey, Cornelius, Hallmark, Roper & Hicks, LLP, Lufkin, for appellee.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

DAVID B. GAULTNEY, Justice.

Motel Enterprises, Inc. ("Motel") sued U.S. Restaurant Properties Operating L.P. ("USRP") and U.S. Restaurant Properties, Inc. for breach of contract. A jury awarded Motel $550,000. This appeal challenges the sufficiency of the evidence, the measure of damages, the jury charge, evidentiary rulings, and the calculation of prejudgment interest.[1]

### BACKGROUND

Motel owned numerous Dairy Queens ("DQs"). Thirty-seven of the DQs were sold to USRP, which then leased them to Bar S Restaurants, Inc. ("Bar S") in a lease-purchase arrangement. USRP paid Motel almost $12,000,000 in cash for the Dairy Queens, but that amount was $500,000 short of the actual price. Motel agreed to finance the remaining $500,000 by taking a promissory note on which Bar S, the lessee of the Dairy Queens, was the maker. USRP, Motel, and Bar S entered into a purchase and sale agreement containing the following "put option:"

At any time after the eighteenth (18th) month following the execution of this Agreement, Motel shall have the right to cause USRP, upon delivery of ten (10) days' prior written notice, to purchase that promissory note (the "Note") of even date herewith, executed by Maker [Bar S] and payable to the order of

1. This was the second trial of this case. *See U.S. Restaurant Properties Operating L.P. v.* *Motel Enters., Inc.,* 25 S.W.3d 293 (Tex.App.-Beaumont 2000, pet denied).

Motel in the principal sum of $500,000.00....

Motel may not exercise the put option provided by this paragraph at any time there is a continuing material uncured default by Maker [Bar S] under the Lease Agreement (the "Lease Agreement") described in the Note....

The restaurant lease ("lease") between Bar S and USRP obligated Bar S to keep and maintain each of the Dairy Queens in good order, condition, and repair, as follows:

Tenant [Bar S] shall at its sole cost and expense keep and maintain each of the Premises and Buildings, including sidewalks, landscaping and driveways located on the Premises, in good order and condition and repair, and shall ... make all needed repairs and replacements, interior and exterior, structural and nonstructural, ordinary and extraordinary, including but not limited to, roof, air conditioning and heating systems, replacements of cracked or broken grass [sic], repair of parking areas and driveway....

In April 1997, USRP sent Bar S the first of a series of letters claiming a lease default—specifically the failure to maintain and appropriately repair the properties. USRP's last letter of default to Bar S was in late September 1997. In early November 1997, Motel notified USRP of Motel's exercise of the put option requiring USRP to purchase the note. Claiming Bar S was in default under the lease, USRP refused to purchase the note. Motel's lawsuit followed.

## LIABILITY

■ USRP argues the evidence is legally and factually insufficient to support the jury's answer to the following question:

Do you find from a preponderance of the evidence that at the time Motel Enterprises, Inc. sought to exercise the put option, Bar S Restaurant, Inc. was not in an uncured, material default on the Restaurant Lease [of] Thirty–Seven Dairy Queen Restaurants with U.S. Restaurant Properties Operating L.P.?

_____ Bar S Restaurant Inc was not in an uncured, material default; or

_____ Bar S Restaurant Inc was in an uncured, material default.

The jury found Bar S was not in an uncured, material default on the lease. Using language from the lease, the jury instruction contained the following definition:

You are instructed ... "an uncured, material default on the *Restaurant Lease Thirty–Seven Dairy Queen Restaurants*" ("the Lease") is defined as follows:

....

(d) A failure by [Bar S] to observe and perform any other provision of this Lease to be observed or performed by [Bar S], where such failure continues for twenty (20) business days after written notice thereof by the Landlord to [Bar S]. However, if the nature of the default is such that the default cannot be reasonably cured within the twenty (20) business day period, [Bar S] shall not be deemed to be in default if [Bar S] shall within such period of time commence such cure and thereafter diligently prosecute the same to completion[.]

■ When an appellant attacks the legal sufficiency of an adverse finding on which it does not have the burden of proof, it must demonstrate on appeal there is no evidence to support the adverse finding.[2] *See Croucher v. Croucher*, 660 S.W.2d 55,

---

**2.** Motel did not object to the placement of the burden of proof. No argument is made on appeal that USRP had the burden to prove an uncured, material default.

58 (Tex.1983). On appeal, the evidence is viewed in "a light tending to support the jury's verdict," and "all evidence and inferences contrary to the jury's finding" must be disregarded. *Lenz v. Lenz,* 79 S.W.3d 10, 19 (Tex.2002). In a factual sufficiency review, an appellate court examines all the evidence, and will set aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

When USRP leased the properties to Bar S, some DQs were in disrepair, while others were in "okay" condition. At the beginning of the lease, "[i]t was understood on both sides that the properties were underperforming due to their current condition." The parking lots were a concern, but it was understood that putting the parking lots in "A–1 condition" "wouldn't be immediate." As one witness explained, maintenance on the DQs was a "continuous process;" there were always problems on the facilities that needed addressing.

The record reveals Bar S was performing maintenance on seven stores at issue here. USRP's letters specified that the condition of the seven DQs placed Bar S in default. USRP said the parking lot in Diboll had potholes and needed to be resurfaced and restriped, and the roof required repair. Bar S's improvements and maintenance in Diboll included filling of potholes, a new menu board, new outside lighting, and retrofitting of inside lighting. The Diboll parking lot was scheduled for resurfacing in the summer. USRP's letter alleging defaults at the Humble DQ included no specifics. Bar S responded by noting the following improvements: new parking lot with striping; new paint job inside and out; roof repair; new flooring; and gravel patio with outside tables. Improvements and repairs at the Kountze DQ included a paint job inside and out, restriping of the parking lot, installation of an air conditioning unit, and repair of the overhang. At Waskom, Bar S patched the parking lot and put the building on a schedule for repainting. The resurfacing and striping of the parking lot had not been done. At the Rusk DQ, the parking lot had not been resurfaced, but Bar S was waiting on finalization of a joint site plan with Taco Bell. The weeds and dead plants, complained of in the Rusk letter, would be replaced or already had been. Other problems at Rusk included a soap dispenser on the floor, and the lack of a switchplate in the men's restroom. Carroll Sullivan, Bar S chief executive officer, believed all the repairs, except those to the parking lot, had been completed on the Lufkin DQ, and Bar S was negotiating with Taco Bell to do a new parking lot. At the Livingston DQ, Bar S had not resurfaced the parking lot, but the roof had been fixed and the DQ painted.

In addition to requiring Bar S to keep the properties in good order, condition, and repair, the lease provided for a two year plan for capital improvements and repairs in excess of necessary maintenance. John Pettijohn, who handled the negotiations in USRP transactions, indicated that Sullivan's plan was to spend at least $500,000 in the first eight quarters for capital repairs and improvements, part of which would be for parking lots. Pettijohn explained that capital expenditures are different from repairs which need to be done on a timely basis. Pettijohn's understanding was that the "stores in general ... were in substantial disrepair and a lot of repairs were getting worse." But he testified the resurfacing of a parking lot was a capital improvement. Nancy Sedlak, the assets manager for USRP, testified resurfacing was both a capital improvement and a necessary repair and

would fall within the $500,000 two year expenditures. Sullivan, Pettijohn, and Sedlak all indicated the lease contemplated these types of repairs being made over eight calendar quarters, or two years. At the time Motel exercised the put option, the two years had not expired.

Because it had overfunded the acquisition and did not want to put any more money into the Dairy Queen system, USRP decided not to buy the note. Pettijohn told Sullivan that USRP was building a case, through the letters of default, that would give it grounds to refuse to buy the note. Sedlak testified that during an April 1997 conversation Stetson, the president of USRP, told her to look for any provision of the lease that Bar S was not upholding. According to Sedlak, this conversation took place prior to all the DQ inspections, except for the Lufkin DQ.[3]

As part of its ongoing maintenance program, Bar S had worked on all seven locations, except the closed Lufkin DQ. Although Bar S had not addressed every repair or maintenance issue raised by USRP, the jury reasonably could conclude from the evidence that Bar S kept and maintained the premises and buildings in "good order and condition and repair," that it was making "all needed repairs and replacements," and that it was in compliance with the two year capital improvements program. Further, the jury reasonably could conclude that USRP had determined not to buy the note prior to Motel's exercise of the put option, and simply had set upon a course of action to insure that fact. Though USRP gave notice regarding seven DQs, it never revisited those stores or inquired within the twenty day time frame to see if efforts were being made to cure the claimed problems. We find there is legally suffi-

cient evidence to support the jury finding, and the evidence is not so weak that the finding is clearly wrong and unjust. The challenges to the liability finding are overruled.

## DAMAGES

■ USRP argues the evidence is legally and factually insufficient to support the jury's answer to the following damages question:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Motel Enterprises for its damages, if any, that resulted from U.S. Restaurants' breach of the Put Option?

Consider the following elements, if any, and none other:

The difference, if any, between the value of the Put Option agreed to by the parties and the value of the Put Option as performed by U.S. Restaurants. The difference in value, if any, shall be determined at the time the Put Option was breached.

The jury answer was $550,000.

The put option provided that Motel had the right to cause USRP to purchase the note for 110% of the then outstanding principal balance of the note. It is undisputed that USRP refused to purchase the note. The note provided for payment of monthly interest beginning June 1, 1996, but provided for no payment on principal until May 1, 2001. It is undisputed that at the time Motel exercised its put option on November 3, 1997, the principal balance was $500,000. The jury finding of $550,-000—which is 110% of the outstanding principal balance of the note—accurately reflects these undisputed facts. The suffi-

---

**3.** There were two Lufkin DQs, one of which had been closed. Pettijohn told Sullivan it was not advisable to spend money on the closed store.

ciency challenges to the damages finding are overruled.

## THE NOTE

Motel was awarded $550,000 for USRP's failure to purchase the note, but the judgment does not address the transfer of the note. Motel suggests the judgment be modified to provide for transfer of the note. We modify the judgment to order Motel to legally transfer the note to USRP. *See* TEX.R.APP. P. 43.2(b).

## THE JURY CHARGE

■ USRP argues that the measure of damages submitted to the jury in question 1–A, quoted above, was incorrect. USRP requested the following jury question:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Motel] for its damages, if any, that resulted from the refusal of [USRP] to purchase the note dated April 30, 1996 from [Bar S] payable to [Motel]?
>
> Consider the following elements of damages, if any, and none other.
>
> The difference, if any, between $550,000.00 and the value of the note dated April 30, 1996 from [Bar S] payable to [Motel], as of November 14, 1997.
>
> Do not add any amount for interest on the difference, if any.

■ Motel's measure of damages sought the difference between the value of the put option as agreed to by the parties and the value of the put option as performed. USRP says the measure is wrong, because it does not include any consideration of the losses Motel avoided by not having to perform its contract with USRP. Although Motel contends otherwise, we conclude USRP preserved the issue by tendering and obtaining a ruling on its question and

instruction on the measure of damages. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 240–41 (Tex.1992) (The test for preservation of error concerning the jury charge is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.).

■ The general rule for measuring damages for breach of contract is "just compensation for the loss or damage actually sustained." *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (quoting *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952)). Typically, the "benefit of the bargain" measure, based on an expectancy theory, is the difference between the value represented and the value received. *See Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 163 (Tex.1992)(Phillips, J., concurring). Here, Motel contracted for USRP's purchase of the note in a lump sum of $550,000, so long as eighteen months of the lease had elapsed and Bar S was not in an uncured material default. USRP refused to purchase the note and paid Bar S nothing. The judgment as modified transfers the note to USRP. The question, in effect, asked for the difference between the value as represented or agreed to by the parties and the value Motel received. The damages question submitted in the charge correctly reflects the general rule for measuring breach of contract damages—just compensation for the loss or damage sustained. The challenge to jury question 1–A is overruled.

## EXPERT WITNESS

■ USRP contends the trial court erred in excluding the testimony of Jeffrey Balaban, an expert witness on damages. To be admissible under TEX.R. EVID. 702, an expert's testimony must be relevant to the issues in the case, and must be based on a reliable foundation. *See Exxon Pipe-*

*line Co. v. Zwahr,* 88 S.W.3d 623, 628 (Tex.2002). A trial court has broad discretion in determining the admissibility of evidence. *Id.* at 629. The parties agreed that the purchase price of the note would be 110% of the then outstanding principal balance of the note. It is undisputed that $500,000 was the outstanding principal balance. Mathematically, 110% of $500,000 is $550,000. It is undisputed that USRP paid nothing when it received notice Motel was exercising the put option. The difference between the value of the put option as agreed to and the value of the put option as performed is $550,000, which is the sum awarded.

■■■■ To be relevant, expert testimony must be sufficiently tied to the facts of the case that it will aid the jury in answering the questions presented. *Id.* An expert's opinion also may be excluded as not reliable if the testimony presents too great a gap between undisputed controlling facts and the opinion offered. And expert testimony which is of no assistance to a jury in understanding the evidence or determining a fact issue should be excluded. *See K– Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360–61 (Tex.2000). Given the undisputed facts establishing the amount of the damages calculated under the contract, the trial court did not abuse its discretion in excluding the opinion testimony.

### EVIDENTIARY CHALLENGES

■■■■ USRP says the trial court erred during the damages phase of the trial by (a) admitting evidence of Bar S's financial reversal and failure to pay the note after Motel exercised the put option, and (b) admitting opinion testimony on the difference in value between the put option as agreed to and as performed by USRP. Even if an evidentiary ruling is erroneous, an appellate court ordinarily will not reverse and require a new trial when the testimony is merely cumulative of other properly admitted evidence and is not controlling on a material issue dispositive to the case. *See Texas Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000).

The underlying material and controlling facts supporting the damage calculation under the contract were undisputed, as detailed. The challenged evidence—assuming it need not and should not have been admitted given the undisputed controlling facts—was cumulative of other properly admitted evidence or did not control the damage finding; the admission of the evidence does not require a new trial. The challenges to the trial court evidentiary rulings are overruled.

### MITIGATION OF DAMAGES

■■■■ USRP contends the trial court should have included in the damages question the following instruction on mitigation of damages:

Plaintiff [Motel] had an obligation to exercise reasonable care to lessen or mitigate the damages it claims to have suffered. In determining the amount of damages, if any, which [Motel] may have incurred as a result of USRP's action, you are not to include any amount of damages which [Motel] could have avoided by the exercise of reasonable care.

The parties are entitled to have controlling and disputed fact issues submitted to the jury if they are properly pleaded and supported by the evidence. *See Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995). A trial court may submit controlling issues to the jury by questions, instructions, definitions, or a combination thereof. *See Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 422 (Tex.App.-Corpus Christi 1990, writ denied). When a trial judge refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *See*

*Texas Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex. 2000). The trial court has broad discretion in submitting jury instructions. *See Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791 (Tex.1995). A plaintiff has a duty to mitigate when damages can be avoided by the plaintiff's reasonable efforts made at a "trifling expense or with reasonable exertions." *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 426 (Tex.1995) (quoting *Walker v. Salt Flat Water Co.,* 128 Tex. 140, 96 S.W.2d 231, 232 (1936)). A defendant has the burden of proving the plaintiff's lack of diligence and the amount by which the failure to mitigate increased the damages. *See Geotech Energy Corp. v. Gulf States Telecomm. and Info. Sys., Inc.,* 788 S.W.2d 386, 390 (Tex.App.-Houston [14th Dist.] 1990, no writ).

In arguing for an instruction on mitigation, USRP relies on evidence that (a) Carroll Sullivan had personally guaranteed the note; (b) the guarantee ran only to Motel, the payee on the note; and (c) Motel admitted no efforts were made to enforce the guarantee agreement. But the note with Bar S was not in default at the time USRP breached the put option. The evidence was not relevant to mitigation at that time.

If USRP is claiming Motel had a duty to mitigate after the first trial[4] in this case, we disagree. The trial court's prior judgment ordered Motel to deliver the note, properly endorsed, to USRP. In January 2000, prior to this Court's decision in the first appeal of this case, USRP, Bar S, and Sullivan entered into a "Mutual Release Agreement" in which USRP acquired "substantially all of Bar S assets" and the parties mutually released any claims against the others regarding the note and the purchase and sale agreement. In July 2000, this Court reversed the earlier judg-

ment in Motel's favor, and the second trial resulted. *See U.S. Restaurant Properties Operating L.P. v. Motel Enters., Inc.,* 25 S.W.3d 293, 295 (Tex.App.-Beaumont 2000, pet. denied). We find no error in refusing to include an instruction on mitigation of damages.

### LIABILITY OF GENERAL PARTNER

 U.S. Restaurant Properties, Inc. asserts it is not liable because it was not a party to the purchase and sale agreement; U.S. Restaurant Properties Operating, L.P. signed the agreement. Motel sued both Properties, Inc. and Operating, L.P., and pleaded that Properties, Inc. is the general partner of Operating, L.P. The defendants never denied that Properties, Inc. was liable in the capacity in which it was sued, or asserted that there was a defect of parties. *See* Tex.R. Civ. P. 93. In a general partnership, a partner is liable for partnership debts jointly and severally with all other partners. *See Burnap v. Linnartz,* 914 S.W.2d 142, 151 (Tex. App.-San Antonio 1995, writ denied). Having failed to plead otherwise, Properties, Inc., a general partner, is jointly and severally liable with Operating L.P.

### PREJUDGMENT INTEREST

 In the alternative, USRP asks this Court to reduce the prejudgment interest by the amount of interest Bar S paid to Motel under the terms of the note. Otherwise, says USRP, Motel has a double recovery, since the prejudgment interest was running at the same time Bar S was paying Motel interest on the note. Motel argues the issue is waived, because USRP did not plead offset or credit; Motel asserts a better argument would be that prejudgment interest did not commence until Bar S made its last payment.

 We conclude USRP preserved its complaint below by raising the prejudg-

---

4. The first trial occurred in 1998.

ment interest issue in its motion to modify or reform the judgment, and also that USRP is in effect arguing that prejudgment interest should be calculated from the date Bar S made its last interest payment. Prejudgment interest is compensation allowed by law as "additional damages for lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex.1998). USRP's issue on prejudgment interest is sustained.

With the exception of the prejudgment interest issue, appellants' issues are overruled. Pursuant to TEX.R.APP. P. 43.2(b), the judgment is modified to require Motel to effect legal transfer of the note to USRP. The case is remanded to the trial court for a recalculation of prejudgment interest consistent with this opinion.

MODIFIED AND AFFIRMED IN PART, REVERSED AND REMANDED IN PART.