**Opinion issued October 7, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00258-CV

_____

## INTERNACIONAL REALTY, INC., Appellant

## V.

## 2005 RP WEST, LTD., Appellee

---

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 08-DCV-166063**

---

## CONCURRING OPINION

Appellee, 2005 RP West, Ltd. ("RP West" or the "Seller"), sued appellant, Internacional Realty, Inc. ("IRI" or the "Purchaser"), for breach of a real estate purchase agreement (the "PSA") that committed IRI to buy, upon its completion, an apartment project to be constructed by RP West. The trial court rendered

judgment on the verdict, awarding RP West, the Seller, $4 million in damages, plus pre- and post-judgment interest and attorney's fees. The Purchaser, IRI, challenges that judgment on appeal. Like the majority, I would affirm, but on different grounds.

## Background

The material facts are restated below for ease of reference.

### A.     The PSA and Related Agreements

Hugh Caraway, Jr. was the owner of IRI. Beginning in 1993, IRI developed and purchased apartment complexes with Caraway's equity and third-party financing. Caraway was also involved with Internacional Realty Mortgage Investors ("IRMI"), a related company that arranged real-estate financing for IRI and for third parties.

Robert Wilson, the owner of RP West, developed approximately ten apartment complex properties in Texas over the course of his forty years in the real-estate business, including two in Fort Bend County: The Reserve and The Villas. In addition to his career as a real estate developer, Wilson also worked in mortgage banking from 1971 to 1997.

Caraway and Wilson met in the 1980s. Before the transaction that gave rise to this case, Caraway had bought three properties developed by Wilson, including The Reserve apartment complex. Both Caraway and Wilson contemplated that

The Reserve would be Phase I of an overall development plan, which would culminate with Phase II, The Villas, to be located near The Reserve. Wilson formed RP West, a single-asset limited partnership, for the purpose of the development and construction of The Villas. Wilson was both a limited partner of RP West and the president and sole employee of Wilson RP West GP, LLC, which served as the general partner of RP West.

In March 2006, Caraway, as owner of IRI, and Wilson, as owner of RP West, signed the PSA, setting out their agreement that RP West, as Seller, would build The Villas and sell them to IRI, and IRI, as Purchaser, would purchase that complex upon completion for $21.5 million, with the closing to occur no later than April 1, 2008. The PSA was not contingent upon IRI's securing financing. As required by the PSA, IRI deposited $215,000 in earnest money (the "Earnest Money") with the title company.

Section 8 of the PSA provided remedies for both parties in the event of a breach by the other. In relevant part, Section 8.2 provided that, in the event that the Purchaser, IRI, breached the PSA, the Seller, RP West, could elect one of the following three "sole and exclusive remedies":

> (i) terminate this Agreement and thereupon shall be entitled to the Earnest Money as liquidated damages (and not as a penalty), or (ii) put the Property to Purchaser and sue Purchaser for the Purchase Price, or (iii) pursue the remedy of specific performance of Purchaser's obligations under this Agreement.

Section 8.2 further stated that the parties had provided for liquidated damages "because it would be difficult to calculate, on the date hereof, the amount of actual damages for such breach, and Seller and Purchaser agree that these sums represent reasonable compensation to Seller for such breach."

In addition, Section 8.2 stated: "If Seller elects to put the Property to Purchaser and sue for the Purchase Price, Seller shall have all rights of offset against Purchaser to which Seller may be entitled at law or in equity including the Earnest Money and any sums owed by Seller to Purchaser in respect of such construction financing or otherwise, such right of offset to be applicable against any such debt and assertable against any subsequent holder thereof."

RP West financed construction of The Villas with a construction loan from Amegy Bank for $16.2 million, which Wilson personally guaranteed. The Amegy Bank loan was originally due on March 6, 2008. As a condition of this loan, Amegy Bank required both RP West and IRI to sign a construction loan agreement (the "Tri-Party Agreement"). Under the Tri-Party Agreement, IRI acknowledged and consented to the documents securing the construction loan, specifically including RP West's assignment to Amegy Bank of its rights under the PSA, which expressly included the right to the Earnest Money that IRI had deposited with the title company for its purchase of The Villas. The Tri-Party Agreement also gave Amegy Bank the right to sue for specific performance of the assignment

4

of the Earnest Money to Amegy Bank should IRI default on its obligation to purchase The Villas from RP West.

Because the construction and development cost of The Villas exceeded $16.2 million, RP West took a second "Mezzanine Loan" for $2,113,500 from IRA River Park West II Mezzanine, Ltd., a Texas limited partnership (the "Mezzanine Lender"). Caraway was the manager of the general partner of this partnership. Thus, IRI's business affiliate financed part of the construction of The Villas. The Mezzanine Lender, Carraway's partnership, had repayment rights superior to the equity investors in The Villas but inferior to those of Amegy Bank. However, the Mezzanine Loan was not secured by a second lien on the property. Instead, the Mezzanine Lender "just had an assignment of the . . . individual partner's interest in 2005 RP West." That is, Caraway's partnership, as Mezzanine Lender to RP West for part of the construction cost of The Villas, received an assignment of Wilson's interest in RP West as collateral to ensure RP West's repayment of the Mezzanine Loan.

Approximately a year after IRI and RP West signed the PSA, and before construction of the complex was completed, IRI agreed to sell twelve properties, including The Reserve and The Villas, to an investor named Dennis Trimarchi for

a combined price of more than $318 million (the "Trimarchi Contract").[1] Of that amount, Trimarchi had offered $23,760,000 for The Villas. Thus, by assigning its rights under the PSA to Trimarchi, IRI stood to receive approximately $2.26 million more than it was obligated to pay RP West for the property under the PSA. Caraway intended that IRI close on the purchase of The Villas from RP West (in fulfillment of the PSA) and simultaneously close on the resale of the property to Trimarchi.

On August 21, 2007, Caraway, as owner of IRI, sent Wilson, as owner of RP West, an email explaining the Trimarchi deal and requesting (1) a change in the closing date, (2) release of IRI's Earnest Money held by the title company, and (3) an agreement to replace the Earnest Money with the earnest money that Trimarchi would provide in connection with his contract with the Trimarchi Contract.

On September 6, 2007, RP West and IRI signed an amendment to the PSA ("the Amendment"), which released the original Earnest Money to IRI, required redeposit of the Earnest Money if the Trimarchi Contrat was "not executed by September 21, 2007," and included the following "Assignment of Trimarchi

---

[1] The agreement was prepared on the letterhead of Trimarchi Management and signed by Dennis Trimarchi as "CEO / Managing Member" of DMT, LLC. The agreement identified the buyer as "DMT, LLC or its nominee." I refer to Dennis Trimarchi and his businesses collectively as "Trimarchi."

Earnest Money": "Purchaser [IRI] hereby assigns to Seller [RP West] all of Purchaser's right, title and interest in and to the Trimarchi Earnest Money, which assignment shall become effective immediately upon execution of the Trimarchi Contract. Such assignment is intended to serve as a replacement of the earnest money deposit otherwise provided for under the Villas Contract [the PSA]." The Amendment also stated, "In the event of a conflict between the terms of this Amendment and the other terms of the [Trimarchi] Contract, the terms of this Amendment shall control."

RP West released the Earnest Money in accordance with the Amendment. The Trimarchi Contract was signed before September 21, 2007, and Trimarchi deposited earnest money with Beacon Title as required by the Trimarchi Contract. Trimarchi was able to secure financing for ten of the twelve properties, but on October 1, 2007, it terminated the Trimarchi Contract with IRI as to The Reserve and The Villas. Caraway did not immediately inform Wilson that Trimarchi had terminated the Trimarchi Contract with respect to The Villas. Rather, the next day, Wilson emailed Caraway to inquire about closing on The Villas, and Caraway responded, "We are still scheduled to close November 15."

Two days later, Beacon Title released the Earnest Money from the Trimarchi Contract to IRI. Despite the assignment language in the Amendment to the PSA, Caraway, IRI's president, kept the money. At trial, Caraway could not recall

whether he had informed RP West about having received this Earnest Money, but he said that he kept it because he was continuing to negotiate with Trimarchi, still believing that the sale of The Villas would close on November 15, 2007, as planned and as he had represented to Wilson. At that time, IRI did not have the $21.5 million in cash required for it to close its purchase of The Villas on November 15, and it was not working to obtain financing to complete its purchase of The Villas in the event that the Trimarchi negotiations failed. Caraway acknowledged at trial that nothing in the contract with RP West would "let [him] off the hook" if the Trimarchi deal fell through.

Trimarchi did not close on The Villas on November 15, 2007. Instead, the parties amended the Trimarchi Contract with IRI to requiring closing on The Villas by January 18, 2008. Wilson orally agreed to the change in closing date on behalf of RP West. But, by late December 2007, Caraway had become aware that Trimarchi was unable to secure financing to purchase The Villas.

On January 2, 2008, Wilson sent Caraway an email asking if closing on The Villas was "still on" for January 18. Caraway responded that he would know by Friday of that week, depending on Trimarchi's financing. But on that Friday Trimarchi defaulted on the Trimarchi Contract by failing to deposit new Earnest Money with Beacon Title. IRI had not obtained alternate financing, and it found itself unable to perform under the PSA.

Approximately one week later, RP West's counsel sent an email to IRI's counsel stating that IRI was in default of the PSA and asking Caraway to remit to RP West "the [E]arnest [M]oney originally required pursuant to the contract and required to be redeposited in the [A]mendment in the event the so-called Trimarchi contract was not executed by September 21, 2007." In addition, the email specifically reserved RP West's right to pursue any available remedy for breach of the PSA, stating: "Nothing in this letter is intended or should be construed either as a waiver or an election of any remedy for breach of contract and my client hereby expressly reserves any and all such remedies, including rescission of the [A]mendment for breach thereof."

In mid-January, about a week after the email demand, Wilson wrote to Caraway, requesting that IRI redeposit the Earnest Money that had been released pursuant to the Amendment to the PSA and stating that if the money was not redeposited RP West would contact the title company to obtain the Trimarchi Earnest Money that had been assigned to it under the Amendment to the PSA. But the money was not on deposit with the title company; it was in IRI's bank account. Caraway testified that it was "on deposit with [IRI]" and that if Trimarchi defaulted and the contract terminated, the money would belong to IRI.

On January 22, 2008, Caraway told Wilson that IRI still intended to perform under the PSA. But Wilson responded by email, saying that "a majority of the

9

limited partners [of RP West] have requested the general partner proceed with finding another buyer for The Villas (ASAP) and are requesting [IRI] pay the [E]arnest [M]oney to [RP West] per the [A]mendment [to the PSA] asap."

IRI's attorney then sent a Proposed Second Amendment to the PSA to RP West's attorney. The Proposed Second Amendment included provisions that had not been discussed between the parties.

RP West's attorney rejected the Proposed Second Amendment to the PSA, clarifying by letter that "other than having waited past the November" closing date, "there are no understandings or oral agreements between the parties modifying" the original Amendment to the PSA. RP West's letter requested that IRI immediately pay the Trimarchi Earnest Money to RP West or provide contact information to facilitate RP West's obtaining the Earnest Money from the title company. Finally, the letter stated:

> My client may yet be willing to negotiate with yours regarding the acquisition of the subject property on some basis, but wants yours to understand our legal position, has not and does not hereby waive any of its rights or remedies arising either under the contract or at law and expressly disclaims any oral agreements or understandings at variance with the First Amendment to the original contract. Unless my client gets some immediate, satisfactory response, the general partner intends to list the property for sale with a third party broker.

In late January, Caraway mailed a check for $215,000 to Wilson, who remitted it to Amegy Bank in accordance with the Tri-Party Agreement. Wilson testified that he was still working with Caraway to find a way for IRI to purchase

The Villas at that time, and internal IRI emails showed that it was still looking for financing during February 2008.

Throughout 2008, RP West attempted to find a buyer for The Villas. Both the Amegy Bank construction loan and the Mezzanine Lender's loan were extended during this time frame. As part of the process of extending the Mezzanine Loan, RP West's accounting firm sent the Mezzanine Lender—Caraway's company—a financial statement that showed a $215,000 credit for "proceeds from terminated contract for project sale."

In August 2008, Wilson informed Caraway that he had been unable to find a buyer willing to pay more for the Villas than the $21.5 million IRI had agreed to pay in the PSA. On August 15, 2008, Wilson emailed Caraway, saying that "a third party market sale is not likely" and "[g]iven the situation, [RP West] is exploring all options, but what [RP West] really prefers is that [IRI] purchase the property as originally planned/agreed."

In early September 2008, Wilson sent Caraway a demand letter that reminded Caraway of his January 22 email stating his ongoing intention to purchase The Villas under the PSA:

> RP West still expects IRI to purchase the Property as originally agreed under the [PSA]. However, because IRI is in default of its obligations to purchase the Property, RP West authorized suit to be filed in order to promptly pursue its PUT in the event IRI is unwilling to proceed with the transaction. RP West has withheld service of the petition on IRI in hopes that IRI will honor its obligation to purchase the

Property. A copy of the filed petition is attached to this letter. RP West will agree to defer service and/or extend IRI's answer date so long as satisfactory progress is being made toward the purchase of the Property.

Caraway did not respond to this letter, and he testified that he was surprised because he believed that the PSA had previously been terminated and that RP West had elected to keep the Earnest Money as contract damages.

IRI never bought The Villas. From January through August 2008, IRI did not secure financing to do so, and Caraway testified at trial that the national banking crisis made it impossible for him to obtain financing in the fall of 2008.

Meanwhile, RP West moved forward with its lawsuit for breach of the PSA, and it continued to seek a buyer for The Villas. RP West eventually sold The Villas more than two years later, on December 1, 2010, to a third party, LM-LA River Park LP ("Lane"), for $16.9 million, which Caraway agreed was a reasonable price.

## B.     The Trial

The PSA provided three distinct remedies for the Purchaser's breach of the PSA. The Seller, RP West, could (1) terminate the PSA, retain the Earnest Money, and sue for liquidated damages; (2) "put" The Villas to IRI and sue for the purchase price minus allowed offsets; or (3) obtain specific performance of the PSA. RP West elected the put remedy and brought this lawsuit for breach of the PSA. IRI admitted it breached the PSA but raised several defenses relevant to this

12

appeal: (1) RP West had no available remedy under the terms of the PSA; (2) RP West was barred by waiver and equitable estoppel from recovering under the put remedy in the PSA because it had elected the termination remedy; and (3) RP West was barred from any recovery because the sale of The Villas to a third party rendered IRI's subsequent performance of the PSA impossible.

The case was ultimately tried to a jury. At trial, Caraway testified that IRI initially raised RP West's failure to mitigate its losses by selling The Villas to a third party as a bar to RP West's recovery on its breach-of-contract claim. However, by the time of trial, IRI contended that RP West's sale of The Villas to a third party negated the contractual put remedy in the PSA because RP West was no longer in a position to convey The Villas to IRI. Caraway further testified that he believed that the payment of the Earnest Money to RP West terminated the PSA and ended any further obligation of IRI regarding The Villas. However, he also admitted that IRI breached the contract, that Wilson did not exclude IRI from purchasing The Villas, and that it was "entirely possible" that he had told Wilson to find another buyer.

Wilson repeatedly testified that RP West did not terminate the PSA, did not elect to keep the Earnest Money as contract damages, and did put the property to IRI.

13

At the close of RP West's evidence, IRI moved for a directed verdict. IRI argued that the evidence at trial conclusively established that RP West had elected the termination remedy and terminated the PSA in January 2008. IRI contended that RP West did not plead mitigation of damages and had no mitigation reason to have sold the property to a third party. IRI further argued that RP West waived its right to recover on its claims against IRI—or was estopped from recovering— because it had elected the Earnest-Money remedy, remained silent after January 2008, and sold The Villas to a third party. IRI argued that any judgment allowing RP West to recover under the PSA was barred by impossibility as a matter of law; that is, RP West could not elect the put remedy in the PSA because it no longer owned The Villas and thus it was "impossible" for RP West to convey it. In addition, IRI contended that the put remedy was no longer available to RP West because the requirements for seeking specific performance—such as remaining ready, willing, and able to perform until the date of trial—were not satisfied.

The trial court denied IRI's motion for directed verdict. The jury found that (1) the assignment of the Trimarchi Earnest Money was not "complete and unconditional," (2) RP West did not elect the termination remedy in the PSA and did elect the put remedy, and (3) IRI's failure to comply with the PSA as amended was not excused by impossibility. The jury awarded $4 million in damages to RP West.

14

IRI filed a motion to disregard the jury findings and for judgment notwithstanding the verdict ("JNOV"). This motion reiterated all of the arguments IRI had made in support of its motion for directed verdict. It further argued that RP West was entitled only to $215,000 in liquidated damages and could not recover monetary damages because both the "put" and specific performance remedies in the PSA required RP West to convey The Villas to IRI, and, because RP West had sold The Villas to a third party, those two contractual remedies were unavailable.

In its JNOV motion, IRI also argued that RP West had repudiated the PSA by repeatedly stating that IRI had no enforceable right to purchase The Villas and was in default, by demanding forfeiture of the Earnest Money, and by communicating RP West's intent to find a new buyer. IRI argued that the put remedy in the PSA was no longer available to RP West because the requirements for "specific performance" of RP West's obligations with respect to that remedy— its remaining ready, willing, and able to perform until the date of trial—were not satisfied. IRI also argued that RP West's sale could not have been in furtherance of mitigation of damages because RP West had no duty to mitigate under the PSA.

The trial court rendered judgment on the verdict in favor of RP West for $4 million plus prejudgment interest and attorneys' fees. IRI filed a motion for

15

new trial, which was overruled by operation of law, and it timely filed a notice of appeal.

## Issues

IRI brings eight issues on appeal. In its first issue, IRI challenges the trial court's denial of its motion for directed verdict, motion to disregard jury findings, and motion for JNOV, all of which were based on IRI's interpretation of the exclusive remedies specified in the PSA. In its second, third, and fourth issues, IRI challenges the trial court's rulings on its defenses of impossibility, waiver, and estoppel. IRI's fifth issue challenges the trial court's ruling and the jury's finding that RP West did not choose to retain IRI's Earnest Money and terminate the agreement as a remedy for breach of contract. IRI's sixth issue challenges the sufficiency of the evidence to support the jury's finding that RP West chose the contractual remedy of "put[ting] the Property to [IRI] and su[ing] [IRI] for the Purchase Price." In its seventh issue, IRI argues that the jury's damages award is legally and factually insufficient and that the trial court erred in failing to instruct the jury on the correct measure of damages. Finally, in its eighth issue, IRI contends that the trial court erred by awarding RP West attorney's fees and pre-and post-judgment interest. Assuming success on its other issues, IRI asks this Court to render judgment that it should recover attorney's fees as a prevailing party under the contract.

16

Essentially, IRI asks us to construe the PSA in its favor and to reverse the trial court's judgment, render judgment in its favor, and award it its attorney's fees.

I would analyze IRI's issues with respect to the merits of RP West's claim together.

**Analysis**

**A.    Standard of Review**

This appeal requires us (1) to interpret Section 8.2 of the PSA, which sets out the remedies available to the Seller, RP West, in the event of breach of the PSA by the Purchaser, IRI, and (2) to the extent the PSA is ambiguous and therefore presented questions for resolution by the jury, to determine whether the evidence was legally and factually sufficient to support the jury's verdict.

When construing a contract, the court's primary concern is to give effect to the parties' intent as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). To determine the intent of the parties, we examine the entire writing and strive to harmonize and give effect to all provisions in the contract, so that no provision is rendered meaningless. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011); *Frost Nat'l Bank*, 165 S.W.3d at 312. "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a

17

construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). In doing so, we give contract terms "'their plain and ordinary meaning, unless the contract indicates that the parties intended a different meaning.'" *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)).

If, after applying the pertinent rules of construction, we can give the contract a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. "'A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.'" *Dynegy Midstream Servs.*, 294 S.W.3d at 168 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)); *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A simple lack of clarity or disagreement between parties does not necessarily render a term ambiguous. *See DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). If, however, a contract is susceptible to two or more reasonable interpretations, it creates a fact issue for the trier of fact. *See Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 38–39 (Tex. 2012); *Frost Nat'l Bank*, 165 S.W.3d at 312.

The jury determines the credibility of the witnesses and the weight to be given their testimony and resolves conflicts in the evidence. *Kroger Co. v. Persley*, 261 S.W.3d 316, 319 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988)). We review challenges to the legal sufficiency of the evidence to support the verdict in accordance with the *City of Keller* standard, determining whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review factual sufficiency challenges to determine whether "the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Kroger*, 261 S.W.3d at 319.

**B.    Remedies Available to RP West for IRI's Breach of the PSA**

Section 8.2 of the PSA, governing "Breach by Purchaser," sets forth specific "sole and exclusive remedies" available to RP West, as Seller, in the event of a breach of contract by IRI, as Purchaser.

Under section 8.2 of the PSA, RP West could elect to:

    i.  terminate this Agreement and thereupon shall be entitled to the Earnest Money as liquidated damages (and not as a penalty), or

    ii.  put the Property to Purchaser and sue Purchaser for the Purchase Price, or

    iii. pursue the remedy of specific performance of Purchaser's obligations under this Agreement.

Subsection 8.2(i) provided for RP West to keep the Earnest Money as liquidated damages "because it would be difficult to calculate, on the date hereof, the amount of actual damages for such breach, and [RP West] and [IRI] agree that these sums represent reasonable compensation to [RP West] for such breach."

Section 8.2 also provided that if RP West elected to put the property to IRI and sue for the purchase price under subsection 8.2(ii), RP West would have

> all rights of offset against Purchaser [IRI] to which Seller [RP West] may be entitled at law or in equity including the Earnest Money and any sums owed by Seller to Purchaser in respect of such construction financing or otherwise, such right of offset to be applicable against any such debt and assertable against any subsequent holder thereof.[2]

While the three remedies provided by the PSA for IRI's breach were "sole and exclusive" alternative remedies, nothing in the PSA mandated that RP West elect any of these three remedies over any other in any given circumstances. Under the unambiguous language of the PSA, RP West was free to elect any one— but only one—of the three remedies set out in Section 8.2 in the event of a breach of the PSA by IRI.

---

[2] The reference to "any sums owed by Seller to Purchaser in respect of such construction financing" referred to the Mezzanine Loan, made pursuant to Caraway's partnership's agreement to "loan certain funds" to RP West "to finance the construction" of The Villas.

**1. Termination of the PSA and Retention of the Earnest Money Under Subsection 8.2(i) of the PSA**

The first remedy provided for in section 8.2 of the PSA was for the Seller, RP West, to terminate the contract and to keep the Earnest Money. IRI argues that RP West elected this remedy.[3] RP West denies this. The jury answered 'no' to the question of whether RP West elected this remedy. I agree with RP West and the jury.

Subsection 8.2(i), the termination provision, is a liquidated damages clause. Section 8.2 states that "Seller and Purchaser have made this provision for liquidated damages because it would be difficult to calculate, on the date hereof, the amount of actual damages for such breach, and Seller and Purchaser agree that these sums represent reasonable compensation to Seller for such breach." *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) ("In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation."). Common-law

---

[3] IRI's fifth and sixth issues concern the trial court's rulings and the jury's findings as to which contractual remedy RP West elected to pursue. In its fifth issue, IRI contends that the court erred by denying its motion to disregard jury findings and motion for JNOV because, as a matter of law, RP West elected the earnest money remedy as its sole and exclusive remedy for breach of the PSA. IRI alternatively contends that the jury's answer that RP West did not elect the earnest money remedy was against the great weight and preponderance of the evidence. In its sixth issue, IRI contends that the evidence was both legally and factually insufficient to support the jury's verdict that RP West elected the "put" remedy.

"actual damages" for a breach of the PSA at the time of RP West's termination of it would have required a determination of the market value of The Villas on the date of IRI's breach, accompanied by findings that the harm caused by the breach was difficult to estimate and that the amount of liquidated damages called for was a reasonable forecast of just compensation. *See, e.g.*, *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (market value is price that would be offered by willing buyer to willing seller, when neither is under compulsion to buy or sell); *Barry v. Jackson*, 309 S.W.3d 135, 140 (Tex. App.—Austin 2010, no pet.) ("When the breach of contract is for real estate, the measure of damages is the difference between the contract and the property's market value at the time of the breach.").

The record shows that RP West did not attempt to terminate the PSA and keep the Earnest Money as its damages in accordance with subsection 8.2(i) of the PSA. Nor did RP West seek, or the trial court make, any findings that the harm caused by IRI's breach of the PSA was difficult to determine or that the amount of liquidated damages provided for in subsection 8.2(i) was a reasonable forecast of just compensation to RP West for IRI's breach. Rather, the evidence at trial showed that RP West repeatedly demanded performance; agreed to extensions of closing to enable IRI to perform; reserved its rights and remedies in writing; stated that it was not waiving any remedy; and asked IRI to purchase The Villas. RP

22

West announced itself ready and willing to close on The Villas and insisted on IRI's purchase of the complex on the closing date. However, IRI was unable to obtain financing and did not perform. RP West then allowed IRI extra time to attempt to arrange financing; and, when it became apparent that IRI could not, RP West and IRI both attempted to market the property to a third party, both being aware of the other party's attempts. Finally, after filing this suit, RP West succeeded in selling The Villas for $16.9 million—$4.6 million less than the purchase price IRI had agreed to pay in the PSA.

Moreover, in arguing that RP West's retention of the Earnest Money shows RP West's election of this remedy, IRI ignores the effect of the Amendment to the PSA on ownership of Trimarchi's forfeited Earnest Money. Specifically, in the Amendment to the PSA, IRI assigned to RP West all of its "right, title and interest in and to the Trimarchi Earnest Money, which assignment shall become effective immediately upon execution of the Trimarchi Contract." The assignment was intended to serve as a replacement of the Earnest Money deposit otherwise provided for under the PSA. The Amendment provided that if the Trimarchi Contract were not executed by September 21, 2007, IRI would immediately redeposit the Earnest Money.

After Trimarchi defaulted on its agreement to purchase The Villas from IRI, the title company released Trimarchi's Earnest Money to IRI, which kept it.

23

Caraway testified that IRI was holding the money in place of the title company until the date for Trimarchi's closing passed, at which time the money would be IRI's "to do with as we pleased." However, the plain language of the Amendment to the PSA directly contradicts that contention. IRI had already assigned to RP West all of its "right, title and interest in and to" the Trimarchi Earnest Money. Thus, without regard to the contractual termination remedy in the PSA, and in accordance with the Amendment, RP West was entitled to the Trimarchi Earnest Money when Trimarchi defaulted on its contract.

For the foregoing reasons, I conclude, like the majority, that the evidence would enable reasonable and fair-minded jurors to conclude—as the jury did—that RP West did not elect the termination remedy. *See City of Keller*, 168 S.W.3d at 827.

### 2. The Put Remedy Set Out in Subsection 8.2(ii) of the PSA

The second remedy in the PSA was the put remedy set out in subsection 8.2(ii), which permitted the Seller to "put the Property to Purchaser [IRI] and sue Purchaser for the Purchase Price." RP West claims it elected this remedy by reminding IRI it was still obligated to buy The Villas after the closing date, allowing it to continue to attempt to obtain financing or to sell the property, working with it to market the property when these measures failed, and ultimately selling The Villas to a third party, Lane, on December 1, 2010, for $16.9 million.

24

At the time of the sale of the property to Lane, IRI had shown itself unable to perform its contractual obligations and RP West had filed this suit, seeking the $21.5 million purchase price in the PSA as damages. After the sale of the property, RP West sought the difference between the $16.9 million sale price received from Lane, plus the Earnest Money, and the price IRI had agreed to pay for The Villas. RP West contends that the PSA unambiguously authorized it to put the property to IRI by the act of suing it to recover the contractual purchase price. RP West reasons that the PSA's reference in section 8.2 to its entitlement to "all rights of offset against [IRI] to which [it] may be entitled at law or in equity," including the Earnest Money and any sums it owed to IRI with respect to the construction financing, means that the remedy "specifically contemplated a mitigation sale and allowed for an offset of the price received."

IRI argues, by contrast, that legally insufficient evidence supports the jury's finding that RP West elected the put remedy and was entitled to damages under Section 8.2(ii) of the PSA. It contends that the plain language of the put remedy required RP West to transfer the property to it and then sue it for the purchase price as liquidated damages but that, instead, RP West sold The Villas to a third party. IRI argues that RP West's sale of The Villas rendered its own performance impossible.

25

RP West responds that it did put the property to IRI and sued IRI for liquidated damages in the amount of $21.5 million, the purchase price for The Villas, as provided for the breach under Section 8.2(ii) of the PSA. When IRI was unable either to obtain financing to complete the purchase or to sell The Villas, which both it and RP West were marketing, RP West mitigated its damages by selling the property to a third party, Lane. IRI replies that the PSA imposed no duty of mitigation on RP West.

The jury found that RP West elected the put remedy and awarded it damages against IRI in an amount representing roughly the purchase price IRI had agreed to pay for The Villas in the PSA, offset by the amount of money RP West received from selling The Villas to Lane at fair market value and the Earnest Money received when the Trimarchi sale collapsed.

### a. RP West's election of the put remedy in subsection 8.2(ii)

Although Texas case law has seldom addressed real estate puts, the term is used in the real estate context essentially as it is used in the securities and commodities context, to denote a right of a seller to require another to purchase property at an agreed price at a given time or under given conditions. *See* BLACK'S LAW DICTIONARY 1268, 1432 (10th ed. 2014) (defining "put" as "[a]n option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy"); *U.S. Rest. Props. Operating L.P. v. Motel Enters.,*

26

*Inc.*, 104 S.W.3d 284, 287–88 (Tex. App.—Beaumont 2003, pet. denied) ("put option" in purchase and sale agreement provided that after eighteen months from execution of agreement and upon notice, seller of restaurants had right to cause buyer, who leased them to lessee, to purchase promissory note made by lessee and payable to seller; when buyer refused to purchase note, seller successfully sued buyer for amount of note); *Turboff v. Gertner, Aron & Ledet Invs.*, 840 S.W.2d 603, 605–06, 609–10 (Tex. App.—Corpus Christi 1992, writ dism'd) (put option in PSA entitled sellers (GAL) to put property to purchasers (Turboffs) and purchasers to accept conveyance of property on closing date and to reimburse sellers for costs, fees, and expenses incurred by sellers pursuant to agreement for maintenance and development of property; partial settlement held not to relieve purchasers of responsibility to perform under PSA or to bar sellers' right to recover under contract; sellers were entitled to sell property upon purchasers' breach of PSA); *cf. Doerge v. Nat'l Bank of Commerce*, 482 F. Supp. 802, 804 (N.D. Tex. 1977), *aff'd*, 609 F.2d 1006 (5th Cir. 1979) (real estate purchaser/lessor (Doerge) and seller/lessee (Hill) agreed in contract for development and sale of apartment project that, at closing of sale of apartment project developed by seller, purchaser would pay some cash and execute installment note in favor of seller for purchase price, and seller would lease project from purchaser; purchaser also had put option, exercisable if rent rolls of completed project were less than given sum, to terminate

his obligation to pay balance of purchase price then due and, instead, to deliver to seller quitclaim deed for undivided one-half interest in property).

I would hold that this case reflects a trade usage of the term "put" in the real estate context that falls squarely within the line of real-estate put cases evinced by *U.S. Restaurant Properties*, *Turboff*, and *Doerge*; and that it was properly decided under the put theory provided for by subsection 8.2(ii) of the PSA. *See Frost Nat'l Bank*, 165 S.W.3d at 312 ("We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served. . . .'"); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 222(1) (1981) ("A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement.").

I agree with RP West's argument that the plain language of Section 8.2 of the PSA provided for exercise of the put remedy by RP West's putting The Villas to IRI, in accordance with the customary understanding of a real estate put, and then suing IRI for the purchase price of $21.5 million set out in the PSA. *See Doerge*, 482 F. Supp. at 808. RP West permitted IRI both to continue to seek financing after the closing date had passed and to attempt to sell The Villas to a third party. When those efforts to obtain payment for the property failed, RP West sued IRI for the purchase price in the PSA.

28

### *b. RP West's entitlement to damages under the put remedy*

The put remedy set out in subsection 8.2(ii) of the PSA entitled RP West, in the event of IRI's breach of the PSA, to put the property to IRI and to sue IRI for the purchase price. It also entitled RP West to all rights of offset including recovery of the Earnest Money and the excuse of amounts owed by RP West to IRI with respect to the construction financing. The general rule for measuring damages in a breach of contract case is "just compensation for the loss or damage actually sustained." *U.S. Rest. Props.*, 104 S.W.3d at 291 (quoting *Phillips*, 820 S.W.2d at 788). Typically, the "benefit of the bargain" measure of damages is "the difference between the value represented and the value received." *Id.*; *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992) (Phillips, J., concurring).

Here, the damages available under the put remedy in the PSA for IRI's breach of the PSA were benefit of the bargain damages. I, therefore, agree with RP West and the jury that the proper measure of damages for IRI's breach was the purchase price of The Villas agreed to in the PSA, or $21.5 million, less offsets for the Earnest Money and the fair market value of The Villas at the time of its sale to Lane, as represented by the amount received from Lane, a third party at that sale— or the roughly $4 million found by the jury. *See U.S. Rest. Props.*, 104 S.W.3d at 290–91 (holding award of damages proper in breach of real estate put case where plaintiff sought as damages "the difference between the value of the put option as

agreed to by the parties and the value of the put option as performed"; parties agreed that purchase price of promissory note would be 110% of then outstanding principal balance of note; it was undisputed that $500,000 was outstanding principal balance and that purchaser paid nothing when it received notice seller was exercising put option; and difference between value of put option as agreed to and value of put option as performed was $550,000, which was sum awarded).

I further agree with RP West that its sale of The Villas to Lane was in in fulfillment of its obligation to mitigate its damages, a duty that arises from the common law, not from the terms of a contract, as IRI urges.

The common law doctrine of mitigation of damages "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff." *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). Under Texas law, a claimant is required "to mitigate damages if it can do so with trifling expense or with reasonable exertions." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999); *Great Am. Ins. Co.*, 908 S.W.2d at 426; *U.S. Rest. Props.*, 104 S.W.3d at 293. In a breach-of-contract suit, amounts that a plaintiff recovered or should have recovered through mitigation of damages are offset against his recovery. *See, e.g.*, *McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 278 (Tex. App.—Dallas 2006, no pet.); *Murphy v. Gulf Consol. Servs., Inc.*, 666 S.W.2d 383, 383–84 (Tex.

App.—Houston [14th Dist.] 1984, no writ). There is no requirement in Texas law that the duty to mitigate arises only if a contract expressly incorporates this common law duty.

I would hold, therefore, that, having elected the put remedy, RP West properly sought damages under a benefit of the bargain theory, that it had a duty to mitigate its damages, that it properly mitigated its damages by selling The Villas at fair market value when IRI was unable either to obtain financing to purchase the property or to find another buyer, and that the damages awarded it represented the benefit of the bargain once the Earnest Money and the purchase price of The Villas paid RP West by Lane were subtracted from the price IRI had promised to pay RP West.

### c. Sufficiency of the evidence to support the jury's award of $4 million in damages to RP West

IRI contends, however, that the evidence is legally and factually insufficient to support the jury's award of $4 million in damages to RP West for IRI's breach of the PSA under the benefit of the bargain measure.[4]

---

[4] Alternatively, IRI contends that the trial court erred by failing to instruct the jury on the correct measure of damages. I agree with the majority that although IRI made a request for deletion of instructions originally included in the jury charge on this question and substitution of other instructions, in the end, IRI agreed with the trial court's decision to submit no instruction on damages at all, and it failed to object to the omission of an instruction as to damages or to request such an instruction in substantially correct form. Therefore, this part of issue seven is

In Question No. 4, the jury charge asked:

> What sum of money, if any, paid now in cash, would fairly and reasonably compensate 2005 RP West, Ltd. for its damages, if any, resulting from Internacional Realty, Inc.'s failure to comply with the Purchase and Sale Agreement as amended by the First Amendment.

> Do not add any amount for interest on damages, if any.

The jury answered, "$4,000,000.00."

IRI contends that the only evidence of damages was the PSA. The record, however, refutes this claim. As the majority points out, Wilson and Caraway both testified that the contract price of The Villas was $21.5 million and the contract itself was entered into evidence. Second, both the contract and the testimony at trial showed that when RP West demanded that IRI forfeit the Earnest Money, IRI paid RP West $215,000. The evidence at trial also showed that RP West mitigated its damages by selling The Villas for $16.9 million. Subtracting the Earnest Money and ultimate purchase price, both allowable offsets, from the $21.5 million contract price results in a sum of $4,385,000, which is $385,000 more than the jury awarded.

---

waived. *See* Slip Op. at 40–41; TEX. R. APP. P. 33.1; *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829–30 (Tex. 2012). In the absence of an objection to the court's charge, we evaluate the sufficiency of the evidence in light of the court's charge as given to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

IRI also contends that the jury failed to account for $3.8 million in earnings from The Villas that RP West earned between 2008 and 2010. However the evidence was in conflict on that matter, with Wilson testifying that most of the income was used to pay for operating expenses. *See* Slip Op. at 42. It was within the province of the jury to resolve this conflicting evidence. *Kroger*, 261 S.W.3d at 319.

I, therefore, agree with the majority that the evidence was legally and factually sufficient to support the jury's award of $4 million in damages. *See City of Keller*, 168 S.W.3d at 827 (evidence is legally sufficient when it "would enable reasonable and fair-minded people to reach the verdict under review"); *Kroger*, 261 S.W.3d at 319 (evidence is factually sufficient unless it "is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust").

### 3. Specific Performance Under Subsection 8.2(iii) of the PSA

The third remedy provided by the PSA was the right to "pursue the remedy of specific performance" by IRI of its obligations as purchaser. RP West did not sue IRI for this remedy. I mention it only to distinguish it as inapplicable and to respond to IRI's argument that, by selling The Villas to Lane, RP West did not remain "ready, willing, and able to perform" under the PSA, which IRI contends it had a duty to do under the *put* remedy until the trial. IRI contends that RP West

breached this duty, excusing IRI's own performance as "impossible." I find IRI's argument to be without merit.

"The purpose of specific performance is to compel a party who is violating a duty to perform under a valid contract to comply with his obligations." *Griffin's Estate v. Sumner*, 604 S.W.2d 221, 225 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.). "[T]o be entitled to specific performance, the plaintiff must show that it has substantially performed its part of the contract, and that it is able to continue performing its part of the agreement," and the "plaintiff's burden of proving readiness, willingness and ability is a continuing one that extends to all times relevant to the contract and thereafter." *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008) (quoting 25 RICHARD A. LORD, WILLISTON ON CONTRACTS § 67:15, at 236–37 (4th ed. 2002) (citations omitted)). "[A] plaintiff seeking specific performance, as a general rule, must actually tender performance as a prerequisite to obtaining specific performance." *Id.* (citing *McMillan v. Smith*, 363 S.W.2d 437, 442–43 (Tex. 1962)). However, "when a defendant refuses to perform or repudiates a contract, the plaintiff may be excused from actually tendering his or her performance to the repudiating party before filing suit for specific performance." *Id.* Specific performance is an equitable remedy employed when "the recovery of monetary damages would be inadequate to compensate the complainant." *Sumner*, 604 S.W.2d at 225; *see also DiGiuseppe*, 269 S.W.3d at

593–94 (discussing showing required to obtain equitable remedy of specific performance).

Here, RP West did not seek to be excused from performing under the PSA. It fully performed its contractual obligations and was prepared to close the sale of The Villas to IRI on the closing date. *See DiGiuseppe*, 269 S.W.3d at 594. Instead, it was IRI who did not perform. When IRI could not pay for the property—*after* RP West had put the property to it by refusing to release it from its obligation to buy The Villas as provided in the PSA—RP West sued IRI for the purchase price, sold The Villas itself, and was fully compensated by a monetary award of damages in this litigation of $4 million, representing roughly the difference between the purchase price under the PSA of $21.5 million and the $16.9 million market price it received for the sale of The Villas to a third party plus the $215,000 in Earnest Money it recovered. *Cf. Sumner*, 604 S.W.2d at 225 (specific performance is equitable remedy employed when recovery of monetary damages would be inadequate to compensate complainant).

The record clearly demonstrates that RP West did not seek specific performance and that it is inapplicable to the circumstances of this case.

I would hold that this case is properly characterized as a breach of contract case under the put option, that RP West proved the elements of breach of that

provision of the PSA and recovered the benefit of its bargain, and that the jury findings on breach, mitigation, and damages were proper.

## C.   IRI's Defenses of Impossibility, Waiver, and Estoppel

IRI's second, third, and fourth issues concern its affirmative defenses. In its second and third issues, IRI contends that the trial court erred by denying its motions for directed verdict, to disregard jury findings, and for JNOV. In its fourth issue, IRI contends that the trial court erred by granting RP West's motion for directed verdict on IRI's estoppel defense and by failing to submit its estoppel defense to the jury. I agree with the majority that these arguments are all unavailing.

### 1.  Standard of Review of Directed Verdict and JNOV

A trial court may order a directed verdict in favor of a defendant when: (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery; or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A motion for JNOV should be granted if the evidence is legally insufficient to support the jury's findings or if a directed verdict would have been proper because a legal principle precludes recovery. TEX. R. CIV. P. 301; *see Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 320 (Tex.

App.—Houston [1st Dist.] 2011, no pet.). Similarly, a court may disregard a jury finding if it is unsupported by evidence or if the issue is immaterial, i.e., the issue should not have been submitted or was properly submitted and rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994).

## 2. Impossibility

In its second issue, IRI contends that the trial court erred in denying its motion for directed verdict on impossibility because RP West's sale of The Villas to a third party made it impossible for it to transfer The Villas to IRI.

Impossibility is a defense to a cause of action for breach of contract. *Tractebel Energy Mktg., Inc. v. E. I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 66 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Where a party's performance is made impracticable "by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged . . . ." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981)). Here, at the time RP West insisted on IRI's performance of its obligation to purchase The Villas as provided in the PSA and sued it for damages for failing to purchase the property, IRI's performance was not made impossible by the occurrence of an event whose non-occurrence was a basic assumption on which

the contract was made, and IRI has identified no "act of god" or other event that excused its admitted breach. RP West's subsequent mitigation of its damages when IRI proved unable either to obtain financing to complete its purchase of The Villas or to find another purchaser does not retroactively create an impossibility defense excusing IRI's lack of performance.

### 3. Waiver

In its third issue, IRI argues that the trial court erred by denying its motion for directed verdict and failing to submit its waiver and estoppel defenses to the jury.

"Waiver is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan*, 111 S.W.3d at 156. Only actions that are inconsistent with an intent to rely on a right can be evidence of waiver. *See id.*

IRI argues that RP West waived the put remedy by informing IRI that it was in default of the PSA, demanding and accepting the Earnest Money, telling IRI that it had no enforceable right to buy the property, entering into a sales and marketing agreement with a realtor to seek a third-party buyer, setting a sales price higher than the $21.5 million contract price, negotiating a concession on the realtor's commission, selling The Villas to a third party, and failing to continually communicate with IRI. IRI also relies on financial statements it received from RP West's accountant related to the Mezzanine Loan that characterized the Earnest Money as proceeds from a terminated contract for project sale.

I agree with the majority that the actions that IRI identifies do not demonstrate RP West's intention to waive its contractual put remedy. As the majority states, the put remedy specifically contemplated that the Earnest Money would be used to offset to any recovery won by RP West. Slip Op. at 32. Thus, RP West's acceptance of IRI's check in the amount of the Earnest Money was not inconsistent with its election of the put remedy. *Id.* Second, as the majority also states, RP West expressly reserved its right to elect a remedy in a January 2008 email from its lawyer to IRI's lawyer. *Id.* Its election of the put remedy is inconsistent with the intentional relinquishment of that right and, therefore, does not constitute waiver. *See Jernigan*, 111 S.W.3d at 156.

39

The evidence does not support IRI's waiver defense. A trial court errs by submitting a question to the jury that is not supported by the evidence, not by *failing* to submit a question that is not supported by the evidence. *See* TEX. R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). Therefore, I agree with the majority that the trial court did not err by refusing to submit IRI's question on waiver to the jury. Nor did it err by failing to grant IRI's motion for a directed verdict on the issue of waiver.

## 4. Estoppel

In its fourth issue, IRI contends that the trial court erred by granting RP West a directed verdict on IRI's estoppel defense, and, in the alternative, that the trial court erred by failing to submit IRI's estoppel defense to the jury. IRI argues that the evidence conclusively shows that RP West made false representations and concealed material facts, and therefore, the court should have submitted its equitable estoppel defense to the jury.

Equitable estoppel is an affirmative defense. *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 188 (Tex. App.—Houston [1st Dist.] 2005, no pet.). "Pleading an affirmative defense permits introduction of evidence which does not tend to rebut factual propositions asserted in the plaintiff's case, but which seeks to establish an independent reason why the plaintiff should not recover." *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991). A defendant seeking to

avoid judgment under the affirmative defense of equitable estoppel must prove: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998).

To establish estoppel, IRI relies on evidence that it stopped seeking financing based on omissions or representations that RP West would not elect the put remedy and on RP West's delay of eight months in exercising the put remedy.

I agree with the majority that none of this evidence establishes an independent reason why RP West should not recover under the put option for IRI's earlier breach of the PSA. *See* Slip Op. at 34–35 (citing *Gorman*, 811 S.W.2d at 546).

## D.     Attorney's Fees and Pre- and Post-Judgment Interest

In its eighth issue, IRI contends that the trial court erred in awarding attorney's fees and pre- and post-judgment interest to RP West. IRI argues that it, not RP West, is entitled to attorney's fees as the prevailing party. Like the majority, I would hold that the trial court did not err in ruling in favor of RP West. Therefore, IRI is not the prevailing party, and it is not entitled to attorney's fees.

41

## Conclusion

I would affirm the judgment of the trial court. Accordingly, I concur in the panel's judgment.


                                Evelyn V. Keyes
                                Justice


Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, concurring.